# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**DANIEL WALTERS,**

      **Plaintiff,**

    v.                                  **Civil Action 2:17-cv-752**
                                            **Chief Judge Edmund A. Sargus, Jr.**
                                            **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Daniel Walters, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **DENIED**, and that judgment be entered in favor of Defendant.

**I.    BACKGROUND**

Plaintiff filed his applications for DIB and SSI on October 22, 2013 (Tr. 203–11, PAGEID #: 248–56), claiming he was unable to work due to a neck impairment, anxiety, and depression (Tr. 247, PAGEID #: 293). His amended onset disability date is May 1, 2013. (Tr. 286, PAGEID #: 332). After his applications were denied initially (Tr. 128–33, PAGEID #: 172–77) and on reconsideration (Tr. 140–45, PAGEID #: 184–89), Plaintiff filed a request for a hearing by an administrative law judge (Tr. 149–50, PAGEID #: 193–94).

Administrative Law Judge Patricia Witkowski Supergan (the "ALJ") held a video hearing on February 3, 2016. (Tr. 38–81, PAGEID #: 80–123). On June 2, 2016, the ALJ issued a decision denying Plaintiff's applications for benefits. (Tr. 20–32, PAGEID #: 62–74). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–3, PAGEID #: 43–45).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on August 24, 2017. (Doc. 1). Plaintiff filed his Statement of Errors on January 8, 2018 (Doc. 12), Defendant filed an Opposition on March 8, 2018 (Doc. 16), and Plaintiff filed a Reply Brief on March 22, 2018 (Doc. 17). Thus, this matter is now ripe for consideration.

**A. Relevant Hearing Testimony**

Plaintiff was born in 1963 (Tr. 204, PAGEID #: 249), and has a high school education (Tr. 30, PAGEID #: 72). He has past work as a union carpenter. (Tr. 45, PAGEID #: 87). Plaintiff testified that he has a driver's license but rarely drives. (Tr. 46–47, PAGEID #: 88–89). At the hearing, Plaintiff acknowledged a past alcohol problem but testified that he has not had a drink since November 15, 2014. (Tr. 49, PAGEID #: 91).

Plaintiff has never been married, does not have any children, and lives alone in an apartment. (Tr. 46, PAGEID #: 88). Plaintiff cooks and cleans to the extent he is able. (Tr. 51, PAGEID #: 93). Plaintiff shops for groceries and can carry them into his apartment in small bags. (Tr. 57, PAGEID #: 99). Plaintiff used to enjoy riding horses, hunting, and shooting guns, but he no longer engages in those activities. (Tr. 50, PAGEID #: 92).

Medical Expert Dr. Charles W. Metcalf (the "ME") testified at the hearing as an impartial witness. (Tr. 58, PAGEID #: 100). He noted that Plaintiff had "four physical areas to examine," namely "[t]he cervical spine, the lumbar spine, the left shoulder, and the left knee." (Tr. 59,

PAGEID #: 101). After discussing evidence of those impairments, Dr. Metcalf opined on Plaintiff's residual functional capacity ("RFC"). (Tr. 64, PAGEID #: 106). The relevant exchange is as follows:

> Q. Do you have an opinion as to [RFC]?
>
> A. Yes, I have an opinion. I've had some difficultly in trying to sort. I don't have any problems with limiting him to lifting no more than 10 pounds on an occasional basis and five pounds on a frequent basis, and his doing postural activities with the lower extremities such as stooping, crawling, kneeling, crouching, no more than occasional. Staying away from ladders and scaffolding, unpredicted heights. I don't know about upper extremity using. You know, raising arms and so forth. This arthroscopic repair of the left shoulder is just too recent to give an opinion on whether that's going to be limiting or not. It may be, but at this time I wouldn't say so. It's too early. The biggest problem in assessing physical function then is standing. Whether he's physically able to stand up for up to six hours in a day with some [INAUDIBLE] sit/stand option. And sit for six hours. Clearly, the history that he relates to his doctors would say that he can't, but they're at a loss to explain why he can't. I don't see physical evidence that I would have to limit him to sedentary. I think it's quite possible that's where he belongs, but from the physical alone, I would put him at a light level. Six hours standing and six hours sitting. The—it's sustaining the—
>
> Q. Why the lifting to 10 pounds? I guess that's the other question that I have in terms of why you would go with a 10 pounds lifting then?
>
> A. Well, I think, you know, there's no doubt he has cervical [INAUDIBLE] spondylosis. I mean there's pretty good evidence of that. And the lumbar area, it's more limited just on the bottom of L5, S1, but yeah—no, he has lumbar spondylosis also. So he's got that and lifting, I think, is one of the things that bothers those. Standing may or may not bother it. Standing and moving around, and doing light exercises may be good for you. It may be bad for you. This will vary from one patient to the next. And I can't say on this particular gentleman. He's not a patient of mine, of course. I'm only looking at the imaging evidence and what his doctors are saying, and his doctors are puzzled by it. So that's where I have a difficulty of just standing. How long he can stand, but I don't have any problem limiting the lifting. Now, I have no doubt that he could lift 50 pounds, but I don't think he should lift as much as 25 on a one-third of a day basis. He probably could, but I think after the second or third day, he'd probably suffer some ill-effects from that. So that's why I limit the lifting and kind of waffle a little bit on the standing. That's about as good

as I can get.

(Tr. 64–66, PAGEID #: 106–08).

Vocational Expert Lee Knutson (the "VE") also testified as an impartial witness. (Tr. 69, PAGEID #: 111). The ALJ asked the VE to assume an individual of Plaintiff's age, education, and work history who has the ability to perform light work as defined in the relevant regulations. (Tr. 70, PAGEID #: 112). The ALJ specified that this individual could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. (*Id*.). The individual, the ALJ explained, could occasionally balance, stoop, kneel, crouch, and crawl and can frequently reach in all directions, handle, finger, and feel with both upper extremities. (*Id*.). The individual could tolerate occasional exposure to and work around vibration and hazard such as moving machinery or unprotected heights. (*Id*.).

The VE testified that, although the individual could not perform Plaintiff's past relevant work, the individual could perform other jobs such as assembler, inspector/checker/weigher, garment sorter, or information clerk. (Tr. 70–71, PAGEID #: 112–13). The VE testified that those opportunities remained available even if the individual were limited to performing simple routine tasks requiring no more than short, simple instructions and simple work-related decision-making with few workplace changes. (Tr. 71, PAGEID #: 113). The VE stated that the individual would need to be on task at least 85% of the time. (Tr. 72, PAGEID #: 114).

The VE also testified that, even if the ME's lifting restriction were accepted, there would still be a significant number of jobs that Plaintiff could perform. (Tr. 72–74, PAGEID #: 114–16). More specifically, Plaintiff would still be able to perform the job of assembler (5,000 state-wide jobs, 181,000 nationally), inspector/checker/weigher (2,200 state-wide jobs, 49,000 nationally), and information clerk (2,800 state-wide jobs and 116,000 jobs nationally). (Tr. 73–

74, PAGEID #: 115–16).

## B. Relevant Medical Evidence

An MRI of Plaintiff's left shoulder in July 2013 showed a full-thickness tear of the anterior supraspinatus tendon, advanced acromioclavicular (AC) joint arthritis, and mild tendinopathy of the superior margin of the subscapularis tendon. (Tr. 400, PAGEID #: 447). An x-ray of Plaintiff's left shoulder in October 2013 showed degenerative changes of the AC joint with spurs pointing inferiorly from the acromion and clavicle. (Tr. 329, PAGEID #: 376). Plaintiff underwent physical therapy for his left shoulder in October 2013 and November 2013. (Tr. 406–21, PAGEID #: 453–68). He was discharged from physical therapy, however, because he was unable to undergo additional testing. (Tr. 468, PAGEID #: 515).

An MRI of Plaintiff's cervical spine from July 2013, showed a narrowing of the spinal canal and degenerative changes causing neural foraminal narrowing and spinal stenosis. (Tr. 332–33, 515, PAGEID #: 379–80, 562).

The state agency reviewing physician Paul Morton, M.D. reviewed Plaintiff's medical record at the initial level on December 10, 2013. (Tr. 98–99, PAGEID #: 141–42). Dr. Morton opined that Plaintiff occasionally could lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (*Id*.). Dr. Morton determined that Plaintiff had an unlimited ability to push and/or pull, subject only to the lifting and/or carrying restrictions. (Tr. 99, PAGEID #: 142).

Following Dr. Morton's opinion, Plaintiff was examined by William Thoman, M.D. on February 10, 2014. (Tr. 513, PAGEID #: 560). Plaintiff reported neck and shoulder pain arising from an incident when he was thrown off of a horse at twelve or thirteen years of age. (*Id*.; *see also* Tr. 439, PAGEID #: 486 (Plaintiff reporting that he had three concussions in high school and was in a motor vehicle accident in 2007); Tr. 513, PAGEID #: 560 (Plaintiff reported being

5

thrown off a horse a second time in 2007 and suffered "severe head trauma throughout his life")). Plaintiff explained that the pain is primarily in his left shoulder area and radiates down the left side of his body. (Tr. 513, PAGEID #: 560). A physical exam showed a decreased sensation on the left side and tenderness to palpation of Plaintiff's neck and left trapezius. (Tr. 514, PAGEID #: 561). Plaintiff also demonstrated a limited range of motion in his neck and left shoulder, and left shoulder tenderness. (*Id.*).

State agency reviewing physician Elizabeth Das, M.D., reviewed Plaintiff's medical record at the reconsideration level on May 1, 2014. (Tr. 122–23, PAGEID #: 165–66). After considering the new medical evidence, Dr. Das opined that Plaintiff was capable of performing a range of light level work but should not push/pull with his left upper extremity. (*Id.*).

Plaintiff underwent surgery to repair his torn rotator cuff on September 24, 2015. (Tr. 628, 661, PAGEID #: 676, 709). A post-surgical MRI of his shoulder on October 7, 2015, showed structural improvement. (Tr. 635, PAGEID #: 683). At an appointment on October 23, 2015, Plaintiff's left arm was still in a sling, but he was no longer taking his prescription pain medications. (Tr. 661, PAGEID #: 709). Plaintiff reported that he was "recovering well" on October 27, 2015. (Tr. 752, PAGEID #: 800). At a follow-up visit on November 11, 2015, Plaintiff stated that his shoulder was doing better, and he had less pain and an improved range of motion. (Tr. 691, PAGEID #: 739).

Plaintiff underwent a functional capacity evaluation on February 16, 2016. (Tr. 778, PAGEID #: 826). Plaintiff was able to push a sled 25 feet with an initial force of 48.5 pounds and a sustained force of 50.5 pounds. (Tr. 779–80, PAGEID #: 827–28). Plaintiff was likewise able to pull a sled 25 feet with an initial force of 46.5 pounds and a sustained force of 49 pounds. (*Id.*).

## C. ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2014, and had not engaged in substantial gainful activity since May 1, 2013, the alleged onset date. (Tr. 22, PAGEID #: 64). The ALJ determined that Plaintiff suffered from the severe impairments of status post left rotator cuff repair, status post right knee arthroscopy, and degenerative disc disease. (*Id*.). However, none of the impairments alone or in combination met or equaled a listed impairment. (Tr. 24, PAGEID #: 66).

The ALJ found that Plaintiff retained the residual functional capacity to:

Perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He can frequently reach in all directions including overhead with both upper extremities. He can frequently handle, finger, and constantly feel with both upper extremities. He can tolerate occasional exposure to and work around hazards such as moving machinery or unprotected heights. He can perform simple routine tasks requiring no more than short simple instructions and simple work-related decision-making with few workplace changes.

(Tr. 25, PAGEID #: 67).

The ALJ stated the following concerning Plaintiff's shoulder and neck impairments:

The objective evidence reveals that on July 29, 2013, Magnetic Resonance Imaging (MRI) of the left shoulder showed full thickness tear of the anterior supraspinatus tendon, advanced acriomioclavicular (AC) joint arthritis, and mild tendinopathy of the superior margin of the subscapularis tendon (Exhibit 3F/98). An x-ray of the left shoulder in October 2013 identified as degenerative changes of the AC joint with spurs pointing inferiorly from the acromion and clavicle (exhibit 3F/27). From October 2013 to November 2013, the claimant underwent physical therapy for his shoulder (Exhibits 3F/103-115 and 124 and 6F/26-59). Notably, he was discharged from physical therapy because it could no longer be continued as he was unable to seek further medical testing. (Exhibit 6F/30-31).

Additionally, the claimant has [a] history of degenerative disc disease of the neck. On July 29, 2013, [a] cervical spine MRI revealed mild to moderate multilevel degenerative disc disease and facet arthropathy, mild spinal canal stenosis at C4-5 and C5-6, and osteophytes with neural foraminal narrowing at multiple levels. (Exhibit 3F/30-31).

(Tr. 26, PAGEID #: 68).

The ALJ found that, although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms "are not entirely consistent with the medical evidence and other evidence in the record…." (Tr. 28, PAGEID #: 70). For example, the ALJ found that clinical findings and Plaintiff's activities of daily living undermine his claim that the shoulder surgery provided him no relief. (Tr. 28–29, PAGEID #: 70–71). The ALJ also noted, *inter alia*, that Plaintiff is able to live alone, cooks, grocery shops, and does chores. (Tr. 29, PAGEID #: 71).

Concerning the ME's hearing testimony the ALJ found:

> Dr. Metcalf opined that the claimant has the [RFC] for lifting 10 pounds frequently, occasional stooping, crawling, kneeling, or crouching, no climbing ladders or scaffolds, and no unprotected heights. Dr. Metcalf noted that lifting exacerbates cervical spondylosis. However, this does not provide much of a reason for the limitation to sedentary work as far as specific abnormal clinical findings or testing that supports this limitation is concerned. Thus, I give this opinion little weight as it is not clear as to the medical expert's opinion and limitation to sedentary work given the objective record and questions raised by the claimant's own treatment doctors as to the basis for his symptoms.

(*Id.*). The ALJ stated the following concerning the state agency medical consultants:

> The State agency medical consultant opined initially that the claimant could perform light work with sitting 6 hours, occasional climbing ladders, ropes, or scaffolds, unlimited climbing ramps/stairs and balancing, and frequent stooping, kneeling, crouching, or crawling (Exhibits 1A and 2A). The State agency medical consultant opined on reconsideration that the claimant could perform light work with sitting 6 hours, occasional climbing ladders, ropes, or scaffolds, unlimited climbing ramps/stairs and balancing, frequent stooping, kneeling, crouching, or crawling, and no pushing/pulling with the left extremity (Exhibits 5A and 6A).

(*Id.*). The ALJ found that the state agency medical opinions were entitled to "some weight" because "they were appropriate given the time the[ ] opinions were prepared…." (*Id.*). The ALJ ultimately determined, however, that "the overall evidence better supports" the RFC set forth in

8

the decision, which was "generally consistent with the State agency opinions." (*Id.*).

The ALJ found Plaintiff unable to complete his past relevant work and changed from a younger individual to an individual closely approaching advanced age. (Tr. 30, PAGEID #: 72). The ALJ noted that Plaintiff has a high school education, is able to communicate in English, and the transferability of jobs skills was not material to the disability determination. (Tr. 30, PAGEID #: 72). The ALJ determined that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 31, PAGEID #: 73). Thus, the ALJ held that Plaintiff has not been under a disability, as defined in the Social Security Act, from May 1, 2013, through the date of the decision. (Tr. 32, PAGEID #: 74).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff sets forth two statements of error. (*See* Doc. 12). Plaintiff first argues that the ALJ's decision was unsupported by substantial evidence because it fails to consider the impact of his torn rotator cuff on his ability to function in the workplace. Next, Plaintiff contends that the ALJ should have adopted the ME's sedentary level lifting and carrying restriction, limiting him to lifting 10 pounds occasionally and 5 pounds frequently. The Court considers Plaintiff's arguments in turn.

### A. Evaluation of Plaintiff's Shoulder Functioning

In his first statement of error, Plaintiff asserts that the ALJ improperly considered his shoulder impairment. As his prime piece of evidence, Plaintiff relies on the state agency consultant's opinion from May 2014, in which the consultant opined that Plaintiff could not push or pull with his left extremity. (*Id*. at 6). Plaintiff acknowledges that he had shoulder surgery in September 2015 (over a year after the May 2014 opinion), but he cites the ME's hearing testimony to argue that it was too early to determine whether that surgery was a success. (*Id*.). Plaintiff further contends that no evidence exists showing that his shoulder impairment had diminished between the May 2014 opinion and the hearing date, despite the ALJ's suggestion to the contrary. (*Id*.).

As an initial matter, Plaintiff did not mention any shoulder impairment when filing his applications for DIB and SSI. (*See, e.g.*, Tr. 247, PAGEID #: 293 (listing a neck impairment, anxiety, and depression as the conditions limiting his ability to work)). Nevertheless, the ALJ adequately considered Plaintiff's shoulder impairment. Specifically, the ALJ discussed the MRI of Plaintiff's shoulder from July 2013, an x-ray of Plaintiff's shoulder from October 2013, and Plaintiff's physical therapy from October 2013 to November 2013. (Tr. 26, PAGEID #: 68).

The ALJ also relied on the ME's hearing testimony that "the claimant's shoulder … ha[d] been corrected with surgery." (Tr. 24, PAGEID #: 66).

The ALJ acknowledged Plaintiff's assertion that he had no relief from the shoulder surgery, but she found it unsupported by the record. (Tr. 28, PAGEID #: 70). Relying on the record, the ALJ determined that Plaintiff's "status post left rotator cuff repair" showed improvement. (Tr. 27, PAGEID #: 69). For example, a post-surgical MRI of his shoulder reflected structural improvement on October 7, 2015 (Tr. 635, PAGEID #: 683); Plaintiff was no longer taking his prescription pain medications on October 23, 2015 (Tr. 661, PAGEID #: 709); Plaintiff reported that he was "recovering well" on October 27, 2015 (Tr. 752, PAGEID #: 800); and Plaintiff stated that his shoulder was doing better, he had less pain, and he had an improved range of motion on November 11, 2015 (Tr. 691, PAGEID #: 739). Additionally, although the ALJ found Plaintiff's functional capacity evaluation on February 16, 2016 of limited probative value, that evaluation demonstrated that Plaintiff was able to push a sled 25 feet (with an initial force of 48.5 pounds and a sustained force of 50.5 pounds) and pull a sled 25 feet (with an initial force of 46.5 pounds and a sustained force of 49 pounds). (Tr. 779–80, PAGEID #: 827–28).

At bottom, the ALJ evaluated the evidence concerning Plaintiff's shoulder condition and determined that it did not prevent him from performing light work. The ALJ is not required to "discuss every piece of evidence in the administrative record." *Hamper v. Comm'r of Soc. Sec.*, 714 F. Supp. 2d 693, 703 (E.D. Mich. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)). Indeed, even if evidence exists to support a different conclusion, the ALJ's decision was within of her "zone of choice." *See, e.g.*, *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (noting that "there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference"). Taking into account the entirety

of the record that the ALJ considered, substantial evidence supports her determination. *See, e.g.*, *Corralez v. Astrue*, No. CV 10-06272-JEM, 2011 WL 1812784, at *7 (C.D. Cal. May 12, 2011) (finding ALJ's decision supported by substantial evidence where the record supported improvement of the claimant's condition following surgery). Accordingly, the Court **RECOMMENDS** that Plaintiff's first assignment of error be **DENIED**.

### B. Consideration of the ME's Lifting Restriction

Plaintiff next argues that the ALJ failed to comply with the regulations governing the weighing of opinion evidence. Specifically, Plaintiff asserts that the ALJ should have adopted the ME's restriction limiting him to lifting 10 pounds occasionally and 5 pounds frequently (sedentary level lifting and carrying) because lifting exacerbates his spondylosis. (Doc. 12 at 7–8).

Here, the ALJ considered the ME's opinion that Plaintiff's cervical spondylosis limits him to sedentary level lifting. (Tr. 29, PAGEID #: 71). However, the ALJ found that the ME did "not provide much of a reason for the limitation … as far as specific abnormal clinical findings or testing…." (*Id.*). Thus, the ALJ found the basis for the ME's lifting restriction unclear. (*Id.*). The ALJ also analyzed the objective evidence and found that it did not support the ME's opined limitation. (*Id.*). Finally, the ALJ noted that Plaintiff's "own treatment doctors" have questioned "the basis for his symptoms." (*Id.*).

On this final point, Plaintiff acknowledges that he "has complaints of left-sided weakness and loss of sensation which the doctors are not able to explain based upon what they observe," but he insists that opinion evidence supports the ME's testimony that Plaintiff's "objectively established conditions could reasonably cause pain which would significantly impair [his] ability to carry out lifting and carrying activities." (Doc. 12 at 12) (stating that an examining physician

and a treating physician "each expressed an opinion that accorded with the conclusions of Dr. Metcalf in his hearing testimony"). He also contends that the ME's lifting restriction is supported by the July 2013 MRI. (*Id.* at 9).

The trouble for Plaintiff, however, is that evidence exists to support the opposite conclusion. For example, a treatment record from November 17, 2014 provides that an examination "of the cervical spine reveal[ed] no tenderness to palpation, no pain, normal cervical spine movements, normal strength and tone, no laxity or crepitus, normal posture and normal coordination and reflexes." (Tr. 530, PAGEID #: 577). Indeed, numerous physical exams revealed Plaintiff had a full range of motion in his neck and no tenderness. (*See, e.g.*, Tr. 598–99, PAGEID #: 646–47 (June 22, 2015); Tr. 611, PAGEID #: 659 (Aug. 17, 2015); Tr. 617, PAGEID #: 665 (Sept. 8, 2015); Tr. 622, PAGEID #: 670 (Oct. 6, 2015), Tr. 628, PAGEID #: 676 (Nov. 3, 2015)). Where substantial evidence supports an ALJ's decision, the Court cannot remand "even if," as Plaintiff suggests, "there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Thus, the Court finds no error on this basis.

Finally, as Defendant argues, even assuming the ALJ erred in not accepting the ME's lifting restriction, the error would be harmless. An error at step four may be harmless if substantial evidence supports the ALJ's conclusion at step five that Plaintiff possesses the vocational qualifications to perform specific jobs. *See Welch v. Astrue*, No. 1:10CV1434, 2011 WL 4632922, at *3 (N.D. Ohio Sept. 30, 2011). At step five, the ALJ had the burden to show that, even if Plaintiff is unable to perform past work, he can work at jobs within the restrictions of his RFC considering the vocational factors of age, education, and prior work experience. *Id.*

at *4 (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. Dec. 20, 2001)). Thus, in order to find harmless error, the ALJ must have satisfied her burden of demonstrating that positions exist in significant numbers in the local and national economies. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004) ("At step five, the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile."). "The determination of what constitutes a significant number of jobs is determined on a case-by-case basis;" there is no "magic number." *Smathers v. Comm'r of Soc. Sec.*, No. 2:14-cv-500, 2015 WL 5568324, at *3 (S.D. Ohio Sept. 22, 2015); *see also Cunningham v. Astrue*, 360 F. App'x 606, 615 (6th Cir. 2010) (noting that this "determination is a fact-specific inquiry, guided by common sense").

Here, the VE testified that, even if the ME's lifting restriction were accepted, Plaintiff still could perform a significant number of jobs. (Tr. 72–74, PAGEID #: 114–16). That is, the VE expressly testified that, even with the lifting limitation, Plaintiff would still be able to perform the job of information clerk, which is 2,800 state-wide jobs and 116,000 jobs nationally. (Tr. 73–74, PAGEID #: 115–16). The VE also explained that, although the number of positions as assembler would be reduced by the lifting restriction, there would still be 5,000 state-wide jobs, 181,000 jobs nationally for that position. (Tr. 73, PAGEID #: 115). The inspector/checker/weigher positions would also be reduced, but 2,200 state-wide jobs and 49,000 national jobs would remain available. (Tr. 73–74, PAGEID #: 115–16). Thus, even assuming the lifting limitation is warranted, there are still a significant number of jobs that Plaintiff can perform. *See Hall v. Bowen*, 837 F.2d 272, 273, 275–76 (6th Cir. 1988). Based on the foregoing, the Court **RECOMMENDS** that Plaintiff's second assignment of error be **DENIED**.

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **DENIED**, and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: May 1, 2018
/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE